In the Matter of the Transfer Tax on the Estate of GEORGE W. SCOTT, Deceased.

Surrogate's Court, Westchester County, May 24, 1927.

**Taxation — transfer tax — decedent died leaving sum of money on deposit with private bank in Virginia — executors paid transfer tax on deposit to said State and removed fund to this State — clear market or net value of property was amount of deposit less tax paid to Virginia.**

In this transfer tax proceeding, it appears that decedent, a resident of this State at the time of his death, had a substantial sum of money on deposit with a private banking house in the State of Virginia. That State assessed a transfer tax on the deposit and on payment of the tax the executors physically brought the balance of the fund into this State. On appraisal of the estate in this State, for transfer tax purposes, the appraiser taxed the gross amount of the fund. Since the State of Virginia properly subjected the fund to a tax, the amount of the property less the tax assessed by the State of Virginia was the clear market or net value of the taxable interest at death, and, therefore, in determining

the amount of transfer tax due, the tax paid to the State of Virginia should be deducted; otherwise the tax assessed in this State upon the gross amount of the deposit in Virginia would be a tax upon a tax and not a tax upon the succession of property pursuant to the Tax Law.

APPEAL from a *pro forma* order of Surrogate's Court, Westchester county, dated June 22, 1926, fixing the transfer tax upon the estate.

*Harrison, Elliott & Byrd* [*Robert W. B. Elliott* of counsel], for the appellants.

*Charles A. Curtin* [*Irving N. Tompkins* of counsel], for the State Tax Commission.

SLATER, S.  The decedent was a resident of Westchester county, N. Y., and died October 30, 1925, leaving a will admitted to probate November 17, 1925.  At the time of his death he had on deposit with Scott & Stringfellow, a private banking house in Richmond, Va., the sum of $443,176.75.  The Commonwealth of Virginia, pursuant to chapter 460 of the Laws of 1922, assessed a transfer tax upon the above stated sum of money in the amount of $8,717.09. This amount was paid by the estate and the balance of the deposit was physically brought within the jurisdiction of the State of New York, without ancillary proceedings and letters.  The executors took the property directly.  On the appraisal of the estate in this State for transfer tax purposes, the tax appraiser taxed the gross amount of the fund which the decedent had on deposit in Richmond, Va.  The executors contend that the amount paid to the State of Virginia, in order to take possession of the property, was a proper deduction from the gross value of the estate for transfer tax purposes.  The State Tax Commission contends otherwise, and thus the question is submitted to the court on this appeal.

Section 220 of the Tax Law (as amd. by Laws of 1925, chap. 143) relating to taxable transfers imposes upon the transfer of any property, real or personal, a tax.  Subdivision 7 of the same section says: " No deduction whatsoever shall be allowed for or on account of any death taxes paid to the United States or *to any state* or territory or foreign jurisdiction."

Section 249-c of the Tax Law (as added by Laws of 1925, chap. 320)* says that " For the purpose of the tax the value of the net estate shall be determined by deducting from the value of the gross estate  *  *  *  amounts for funeral expenses, administration expenses, claims against the estate, unpaid mortgages upon, or any indebtedness in respect to, property,  *  *  *  but not including income taxes upon income received after the death of the decedent, or *any estate, succession*, legacy, or inheritance taxes."

* Since amd. by Laws of 1926, chap. 365.—[REP.

The transfer tax in this State is not a tax upon property, but upon the right of succession to property. (*Matter of Penfold*, 216 N. Y. 163, 167; *State of Colorado* v. *Harbeck*, 232 id. 71.) It is a tax upon the right to receive an estate. The tax is the toll or impost appropriated to itself by the State for, or in connection with, the right of succession to property.

The actual deposit of money in the instant case was in Virginia. Conceding that the deposit was a debt; conceding that it was intangible; still it was property in the State of Virginia for all practical purposes, and in every reasonable sense within the meaning of the Virginia Transfer Tax Act. Virginia was within her right in making a tax upon the deposit at the death of the decedent. Distribution could not be made in this State until the executors had gone into Virginia to get the fund, possibly after resorting to the courts for aid in reducing it to possession. The fund had a *special or business situs* in Virginia because it is subject to Virginia's laws. It is property within the State of Virginia for the purpose of Virginia's succession tax. The right to the deposit is property, because it is capable of being owned and transferred. It is subject to taxation by Virginia because it was under the control of the Virginia laws. (*Matter of Houdayer*, 150 N. Y. 37 [1896]; *sub nom. Scudder* v. *Comptroller*, 175 U. S. 32; *Matter of Blackstone*, 69 App. Div. 127; affd., 171 N. Y. 682; affd., *sub nom. Blackstone* v. *Miller*, 188 U. S. 189 [1903]; *Matter of Daly*, 100 App. Div. 373 [1905]; *State of Colorado* v. *Harbeck*, *supra* [1921]; *Frick* v. *Pennsylvania*, 268 U. S. 473 [1925].)

In the *Blackstone* case the court decided that the transfer of the bank deposit depended upon the law in New York because of the practical fact of the power of New York State over the deposit. This was a case of a *deposit of money* in a trust company in New York, and where the decedent died domiciled in Illinois. The court said (188 U. S. 189): " The New York statute is intended to reach the transfer of this property if it can be reached. * * * Both parties agree with the plain words of the law that the tax is a tax upon the transfer, not upon the deposit * * *. New York * * * recognizes the law of the domicil as the law determining the right of universal succession. * * * No one doubts that succession to a tangible chattel may be taxed wherever the property is found * * *.

" The question then is narrowed to whether a distinction is to be taken between *tangible chattels* and the *deposit in this case.* * * * Courts in New York and elsewhere have been loath to recognize a distinction for taxing purposes between * * * money in the bank and actual coin in the pocket. The practical

similarity * * * has obliterated the legal difference. * * * If the transfer of the deposit necessarily depends upon and involves the law of New York for its exercise, or, in other words, if the transfer is subject to the power of the State of New York, then New York may subject the transfer to a tax. * * * The transfer does depend upon the law of New York, not because of any theoretical speculation concerning the whereabouts of the debt, but because of the practical fact of its power over the person of the debtor."

Clearly the State of Virginia had the right to subject the deposit in the instant case to a succession tax. To enable the executors of the decedent to obtain possession of the deposit, it was further necessary for them to comply with the demands of the State of Virginia and pay the tax imposed by the Tax Law. (*New Orleans* v. *Stempel*, 175 U. S. 309; *Wheeler* v. *Sohmer*, 233 id. 434; *Fidelity &* *Columbia Trust Company* v. *Louisville*, 245 id. 54, 58.)

The troublesome feature of the instant case relates to the character of the asset — *a deposit of money* in a private bank in a State other than the domiciliary State. The character of its use and the time employed in the foreign State has not been disclosed. There is doubtless a factual difference between a bank account and an ordinary debt.

Former section 220 of the Tax Law (Laws of 1909, chap. 62, as amd. by Laws of 1911, chap. 732) speaks of tangible property and intangible property. Section 243 of the same statute said that the words " intangible property " as " used in this article shall be taken to mean incorporeal property, including money, deposits in bank, shares of stock, bonds, notes, credits, evidences of an interest in property and evidences of debt." The section was subsequently amended and by chapter 626 of the Laws of 1919 the definitions relating to tangible property and intangible property were eliminated. It is now clear that the property liable for tax laid on the right of a succession thereto is " the property or interest therein passing or transferred."

The learned counsel for the State Tax Commission, in support of its contention, cites four cases: *Matter of Gihon* (169 N. Y. 443 [1902]); *Blackstone* v. *Miller* (*supra* [1903]); *Matter of Daly* (*supra* [1905]); *Matter of Penfold* (*supra* [1915]).

The *Gihon* case deals with the propriety of the deductions of three certain items: expense of administration, commissions of executors, and the amount of the Federal inheritance tax. Consequently, the case reflects nothing whatever in favor of the State with regard to the instant case.

The *Blackstone* case determined that New York State had the con-

stitutional right to tax a debt owing by a resident of this State to a decedent domiciled in a sister State. The opinion by Mr. Justice HOLMES (p. 205) states: " It may be regretted, also, that one and the same State should be seen taxing on the one hand according to the fact of power, and on the other, at the same time, according to the fiction that, in successions after death, *mobilia sequuntur personam* and domicil governs the whole. But these inconsistencies infringe no rule of constitutional law." The question of deduction of taxes, or whether the tax should be upon the gross amount, or the net amount, did not arise and was not decided.

The *Daly* case related to *money on deposit* and the court held that money on deposit in a technical sense was undoubtedly a debt, and for the purpose of taxation it had a *situs* in this State. This is one of the leading cases which has destroyed the time-honored fiction that movables follow the person. That case dismissed this bothersome legal fiction and established the *situs* at the physical presence of the money on deposit.

The case on appeal in *Matter of Penfold* discloses that the case related to a transfer tax on stocks and bonds. The court held that the transfer tax imposed by the courts of other States, in enforcing the statutes of such other States, should not be allowed as deductions from the clear market value of the estate of the decedent in New York State. It would appear, however, that *Frick* v. *Pennsylvania* (*supra*) has reversed the decision of the State court in the *Penfold* case.

It is the court's view that the cases cited by the learned counsel for the State Tax Commission are not of value to the contention of the Commission.

The question in the instant case does not relate to the validity of the tax in either State, Virginia or New York, but only to the question of the deduction of the transfer tax paid in Virginia.

The transfer tax cases are few that deal with money on deposit. In *Matter of Houdayer* (*supra*) the intangible was money on deposit. The court referred to it as " an investment in this State   *   *   *." That " it was property in this State for all practical purposes, and in every reasonable sense within the meaning of the Transfer Tax Act." The court further said: " While distribution of the fund belongs to the State where the decedent was domiciled, as such distribution cannot be made until his administrator has come into this State to get the fund, possibly, after resorting to the courts for aid in reducing it to possession, the fund has a *situs* here, because it is subject to our laws. A reasonable test in all cases, as it seems to me, is this: Where the right, whatever it may be, has a money value and can be owned and transferred, but cannot be enforced

or converted into money against the will of the person owing the right without coming into this State, it is property within this State for the purposes of a succession tax. Thus the right in question is property, because it is capable of being owned and transferred. It is within this State, because the owner must come here to get it. It is subject to taxation, because it is under the control of our laws. It has a money value, because it is virtually money, or can be converted into money upon demand.

*Blackstone* v. *Miller* (*supra*), on the authority of *Matter of Houdayer* (*supra*), also deals with a deposit of money. Mr. Justice HOLMES said: " What gives the debt validity? Nothing but the fact that the law of the place where the debtor is will make him pay. * * * Power over the person of the debtor confers jurisdiction, we repeat. And this being so we perceive no better reason for denying the right of New York to impose a succession tax on debts owed by its citizens than upon tangible chattels found within the State at the time of the death. The maxim *mobilia sequuntur personam* has no more truth in the one case than in the other. When logic and the policy of a State conflict with a fiction due to historical tradition, the fiction must give way."

In *Bullen* v. *Wisconsin* (240 U. S. 625 [1916]) the decedent was a resident of Wisconsin, and kept stocks, bonds and notes actually in Chicago. No ruling was made with regard to deducting the amount of the Illinois inheritance taxes. The court said: " It is suggested that there was a subordinate error in not deducting the amount of the Illinois inheritance tax. But this appears not to have been assigned in the appeal to the Supreme Court of the State, and therefore we need not inquire whether there was any constitutional obstacle to the State of Wisconsin adopting the gross fund disposed of rather than the net amount received as the measure of the tax."

As to intangible personal property and choses in action, the general rule is that *mobilia sequuntur personam* (movable things follow the person), and they are taxable at the place of the owner's domicile. But this rule has been modified and changed by the disposition to create a special or *business situs* for purposes of taxation. (*Union Refrigerator Transit Co.* v. *Kentucky*, 199 U. S. 194.) " Intangible property "— one view locates it by means of the fiction *mobilia sequuntur personam* at the creditor's domicile (*State Tax on Foreign-Held Bonds*, 15 Wall. 300); another at the debtor's domicile (*Bragg* v. *Gaynor*, 85 Wis. 468, 488); a third considers it may be located by legislative fiat at the debtor's domicile; a fourth considers a debt, since it is intangible, as

being without *situs* (3 Beale Confl. Laws, 507, § 25); a fifth as having its *situs* determined in each case by the purpose involved; a sixth, that it has two *situses*, actual in debtor's domicile and legal at domicile of creditor; a seventh, that where the debt is in form of bond, note or other specialty, its *situs* is where the instrument is (*Bacon* v. *Hooker*, 177 Mass. 335); an eighth, that the *situs* of a debt is wherever the debtor can be found. (*Harris* v. *Balk*, 198 U. S. 215; 31 Harv. Law Rev. 905, 921.)

It has been decided by the courts of this State, as well as by the United States Supreme Court, that a debt due from a resident of this State to a non-resident had its *situs* at the residence of the debtor.

In *Matter of Daly* (*supra*) the court said, in citing the *Houdayer* case, that " the *situs* of the debt at the place of residence of the creditor, where the debtor resided in a foreign jurisdiction, was based upon a fiction of law, well understood and historically traceable, *but that in fact the situs of the debt was at the place of residence of the debtor,* because the creditor in order to compel payment of the debt and receive the money was required to invoke the jurisdiction and the laws of the foreign State; that being compelled to resort to the judicial forum in such State to enforce his rights, the debt within the policy of this statute was to be regarded as due to the creditor at the place where the debtor resided, and where alone he could be compelled to make payment, and that under such circumstances the fiction of the *situs* of the debt as of the residence of the creditor could not obtain as against the policy of the State in imposing the tax. * * * The able and lucid opinion * * * of the court in the *Blackstone* case, leaves nothing to be added to the determination as to the *situs* of the debt, and it is evident to a demonstration that the fiction of law which ordinarily fixes such *situs* should be made to yield. In the construction of State statutes the Supreme Court of the United States is required to adopt the construction placed upon them by the State courts, and the latter construction by the Court of Appeals of this State is binding not alone upon the Supreme Court of the United States, but also upon tribunals inferior thereto within the State. We think there is no infringement of this rule in holding that for purposes of taxation the *situs* of the debt is at the place of residence of the debtor, for the reason that in the *Blackstone* case the construction of this statute was before both courts, both have agreed upon the policy of the State respecting property which could properly be made the subject of taxation, and both have announced the policy of the State respecting such subject."

In modern times, since the great increase in amount and variety of personal property, the rule of the maxim has yielded more and

more to the *lex situs,* the law of the place where the property is kept and used. (*Pullman's Palace Car Co.* v. *Pennsylvania,* 141 U. S. 18, 22.) " ' Taxation is a hard fact ' (*Matter of Hoffman,* 143 N. Y. 327, 334), and for the determination of its incidence, the realities of ' actual and practical ownership ' * * * must count for more in any just system than the style or label of estates." (*People ex rel. Clark* v. *Gilchrist,* 243 N. Y. 173, 181.)

Story's Conflict of Laws (8th ed. § 550), referring to *mobilia sequuntur personam,* says: " It yields whenever it is necessary for the purpose of justice that the actual *situs* of the thing should be examined."

Virginia dealt with the money on deposit in the instant case on the footing of *situs.* It is well settled that bank bills and municipal bonds are in such á ·concrete tangible form that they are subject to taxation where found, irrespective of the domicile of the owner (*Wheeler* v. *Sohmer,* 233 U. S. 434, 439); are subject to seizure. and delivery under replevin; and yet they are but promises to pay — evidences of existing indebtedness. (*New Orleans* v. *Stempel, supra.*) Virginia's privilege tax rests upon the fact that the State has the power of control over the debtor and through that means extends protection or benefit to the foreign creditor. (*Liverpool, etc., Ins. Co.* v. *Orleans Assessors,* 221 U. S. 346.)

" The fiction of law that personal estate has no *situs* away from the person or residence of its owner is done away with, to a limited extent and for a specified purpose, and the truth is substituted in its stead as the rule of action," says Judge VANN in *Matter of Romaine* (127 N. Y. 80, 86), and Chief Judge COMSTOCK in *People ex rel. Hoyt* v. *Commissioners of Taxes* (23 N. Y. 224, 228) says: " I can think of no more just and appropriate exercise of the sovereignty of a State or nation over property situated within it and protected by its laws, than to compel it to contribute toward the maintenance of government and law. Accordingly there seems to be no place for the fiction [*mobilia personam sequuntur*] of which we are speaking, in a well adjusted system of taxation."

Such property is within the State of Virginia in every reasonable sense, receives the protection of its laws and has every advantage from government, for the support of which taxes are laid. (*Matter of Blackstone, supra; Matter of Romaine, supra; Matter of Whiting,* 150 N. Y. 27; *Matter of Bronson,* Id. 1.)

It is interesting to observe that Judge HAIGHT in his dissent in the *Romaine* case from the rule fixing the *situs* at the residence of the debtor, where the " deposits " physically were, was on the ground of double taxation. (See 1 Wharton Confl. of Laws [3d ed.], §§ 80a, 80b, 80c, for a discussion of this subject.)

" The fetish *mobilia sequuntur personam* long ago lost caste, at least as to those *mobilia* whose separation from the *persona* might be detected by human sense of touch and sight. The concept of *situs*, carried over from its application to realty, implies power over the *res*, and is the accepted basis of jurisdiction to deal with chattels. Thus, jurisdiction to tax, to levy an attachment, to administer, and to choose the law governing transmission upon death of the owner are with the State of the *situs*. * * * The tendency has been marked to identify the intangible with the tangible and ascribe to the former the *situs* of the latter." (40 Harv. Law Rev. 989, May, 1927.)

With regard to intangible property, we started with our feet upon an established principle, or maxim of wisdom ages old. But, yielding to the modern day desire to tax wealth for the purpose of paying its due share of the ever-increasing cost of government, we have conveniently discarded the fiction that intangibles follow the person, as obsolete, and proceeded to the practical, that it is legal to tax the intangibles within the State owned by non-residents. New York State has well completed its task. It has learned how to tax intangibles found here belonging to those domiciled elsewhere, on the theory of actual business *situs*. The State Tax Commission cannot find fault when converse facts arise, as they do in the instant case, and the courts apply the law conversely to such facts.

There has been a disagreement in opinions of the courts of the several States with regard to the *deduction* of taxes paid for Federal and State purposes. However, in the case of *Frick* v. *Pennsylvania* (*supra* [1925]), Mr. Justice VAN DEVANTER writing upon this vexed question threw a great light upon a fog bank of learning, and settled the questions raised and considered therein. It was a surprise in view of the opinions and settled practice in a majority of the States.

Henry C. Frick had died in Pennsylvania leaving tangible personalty having an *actual situs* in New York and in Massachusetts. In applying this statute to the Frick estate, the taxing officers in Pennsylvania included the value of the tangible personalty in New York and Massachusetts in the clear value on which they computed the tax, and in fixing that value, refused to make *any deduction on account of the estate taxes paid to other States.*

The court said: " The exaction by a State of a tax which it is without power to impose is a taking of property without due process of law in violation of the Fourteenth Amendment; * * * that while a State may so shape its tax laws as to reach every object which is under its jurisdiction it cannot give them any extra-territorial operation; * * * as respects tangible personal prop-

erty having an actual situs in a particular State, the power to subject it to State taxation rests exclusively in that State, regardless of the domicil of the owner."

Mr. Justice V**AN** D**EVANTER** referred to *Pullman's Palace Car Co.* v. *Pennsylvania* (*supra*), which held that the actual *situs* of tangible personalty, rather than the domicile of its owner, is to be the true test of jurisdiction and power to tax; there it was said: " The old rule, expressed in the maxim *mobilia sequuntur personam,* by which personal property was regarded as subject to the law of the owner's domicil, grew up in the Middle Ages, when movable property consisted chiefly of gold and jewels, which could be easily carried by the owner from place to place, or secreted in spots known only to himself. In modern times, since the great increase in amount and variety of personal property, not immediately connected with the person of the owner, that rule has yielded more and more to the *lex situs, the law of the place where the property is kept and used.*"

In the *Frick* case the property was actually administered in the courts of New York and Massachusetts and none of it was taken to Pennsylvania, the domiciliary State. The court said that the cases of *Blackstone* v. *Miller* (*supra*) and *Bullen* v. *Wisconsin* (240 U. S. 625) were relied on by the State of Pennsylvania. " Both cases related to intangible personalty, which has been regarded as on a different footing from tangible personalty. When they are read with this distinction in mind, * * * it is apparent that they do not support the tax in question. * * * Without question each State had power to tax the transfer of so much of the estate as was under its jurisdiction. * * * The Pennsylvania statute, in so far as it attempts to tax the transfer of tangible personalty having an actual *situs* in other States, contravenes the due process of law clause of the Fourteenth Amendment;'' that the stocks subjected to tax in the other States " practically gave those States the status of lienors in possession. As those States had created the corporations issuing the stocks, they had power to impose the tax * * *. Therefore to bring them into the administration in that State [Pennsylvania] it was essential that the tax be paid. The executors paid it out of moneys forming part of the estate in Pennsylvania and the stocks were thereby brought into the administration there. We think it plain that such value as the stocks had in excess of the tax is all that could be regarded as within the range of Pennsylvania's taxing power. * * * So much of the value as was required to release the superior claim of the other States was quite beyond Pennsylvania's control. Thus the inclusion of the full value in the computation on which that State based its tax, without any deduction for the tax paid to the other States, was

nothing short of applying that State's taxing power to what was not within its range. That the stocks, with their full value, were ultimately brought into the administration in that State does not help. They were brought in through the payment of the tax in the other States out of moneys of the estate in Pennsylvania."

The court held in so far as the statute requires that stocks of other States be included at their full value without deducting the tax paid to those States, it exceeds the power of the State and infringes the constitutional guaranty of due process of law; it also held that the value of the tangible personalty in New York and Massachusetts should not have been included in determining the clear value on which the tax in Pennsylvania was computed.

Is money on deposit to be treated as intangible property, subject to the fiction, or placed in the special intangible list which includes stocks, or created special tangible property? Will the practical similarity obliterate the legal difference? The point involved in the instant case has not been decided by the courts and a legal haze appears to hang over the involved legal proposition. Writers upon this intricate question have been in a quagmire of legal technicalities, and since the *Frick* case have raised the question whether the courts will extend the doctrine of the *Union Refrigerator Transit Co.* case and the *Frick* case to such intangibles as money on deposit and thus firmly establish the system of "one man, one thing, one tax."

In *Matter of Whiting (supra)* Judge VANN said: "Thus the Legislature intended, as I think, to repeal the maxim *mobilia personam sequuntur*, so far as it was an obstacle, and to leave it unchanged, so far as it was an aid, to the imposition of a transfer tax."

The maxim *mobilia sequuntur personam* is summoned to serve as tax collector on incorporeal assets of a domiciled decedent, but is, inconsistently, dismissed as a bothersome impedient whenever property of a non-resident may otherwise be deemed to have a *situs* within the State. (38 Harv. Law Rev. 810, note.)

The State courts in sustaining the validity of the Tax Law permitting the States to levy taxes upon personal property belonging to its citizens, but actually situated beyond its limits, have relied upon the case of *Blackstone* v. *Miller (supra)*. The general rule antedating the *Frick* case rested upon two theories: *first,* upon the old fiction of law *mobilia, sequuntur personam,* and *secondly,* upon the erroneous understanding of the conflict of laws rule based upon convenience, that personalty is distributed according to the law of the domicile of the decedent. (See 24 Mich. Law Rev. 558, Nov. 1925; N. Y. L. J. Nov. 28, 1925, p. 822; 38 Harv. Law Rev. 281.)

The case of *Hollis* v. *Treasurer* (242 Mass. 163 [1922]) relates

to deduction for taxes paid sister States upon stocks and bonds. The court, speaking through its chief justice, says: " These cases present the question whether the amount of excise taxes, lawfully paid to sister States of the Union upon the succession of property within their jurisdiction of a deceased resident of this Commonwealth, may be deducted in order to ascertain the value of the estate on which the succession excise tax required by the statutes of this Commonwealth is to be computed. Stated conversely the question is whether this Commonwealth may levy under existing statutes its succession tax on the amount of money lawfully paid for succession taxes to other States respecting estates of deceased residents of this Commonwealth.

" It is plain as a practical matter that the amount of money so paid for excise taxes never passed to anybody by succession from the deceased resident. * * * Such a tax, apart from its technical legal significance, would be in substance and effect a tax on a tax and not a tax on the succession of property."

The amount paid to Virginia did not come from the decedent to the transferee, nor was it transferred by the decedent. It passed then, or never. It never passed. The true test of value by which the tax is to be measured is the value of the estate at death. How much passes? (*Matter of Penfold, supra.*) If this is law with regard to the question of increase or diminution of an estate during the time which intervenes between the passing of the title and acquiring the possession by the beneficiary, it is law to support the contention that only the net amount received from Virginia passed to the beneficiary. It (the Virginia tax) is a claim or lien existing against the decedent's property at death. (*Matter of Westurn*, 152 N. Y. 93, 102.) The devolution of the property and the right of the State have their origin at the same moment of time. The ascertainment of the value of the taxable interest and the fixing of the tax necessarily takes place ·subsequent to the death. But the guide is the value at the time of death when the interests were acquired. (*Matter of Westurn, supra.*) At the instant the property was acquired, it was subject to the Virginia lien, and the amount of property transferred was less the Virginia lien. The amount of the property less the Virginia lien was the " clear market or net value " of the interest at death.

The principle declared in *Frick* v. *Pennsylvania* (*supra*) with regard to deductions of tax on tangible chattels in foreign States will apply to the instant case. In determining the clear market or net value of the Virginia deposit, it should not have been included at its gross value; the transfer tax paid to Virginia should have been deducted.

It is the court's opinion that the amount of money legally paid to the State of Virginia for death taxes never passed to anybody by succession from the decedent; that the succession tax of the foreign State is a tax which the executor was required to pay in order to reduce that property to possession for the purpose of administration and distribution in the domiciliary State; that the tax as levied here in effect is a tax on a tax, and not a tax on the succession of property; that the tax levied in New York State upon the amount paid to Virginia is unconstitutional; that the State exceeded its power and infringes the constitutional guaranty of due process of law in taxing the amount paid to the State of Virginia.

The report of the transfer tax appraiser should be remitted to the appraiser for revision according to the views herein expressed.